**ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs-Appellants,**

v.

**TENNESSEE WATER QUALITY CONTROL BOARD, et al., Defendants-Appellees.**

Court of Appeals of Tennessee, Middle Section.

April 7, 1983.

Permission to Appeal Denied by Supreme Court July 25, 1983.

Frank M. Fly, Murfreesboro, James Robertson, Claudia Ribet, William D. Brighton, Washington, D.C., Joe W. McCaleb, Hendersonville, James T.B. Tripp, New York City, for plaintiffs/appellants.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Associate Gen. Counsel, Brent R. Marquand, Thomas C. Doolan, Tennessee Valley Authority, Knoxville, Lon P. McFarland, Glenn L. Cox, Columbia, Lee Breckenridge, Asst. Atty. Gen., William Hubbard, Chief Deputy Atty. Gen., Nashville, for defendants/appellees.

## OPINION

CANTRELL, Judge.

The Tennessee Valley Authority, joined by the Upper Duck River Development Agency, Marshall and Maury Counties, and the cities of Columbia and Lewisburg, petitioned the Tennessee Water Quality Control Board for certification under Section 401 of the Federal Water Pollution Control Act and a permit under Section 7 of the Tennessee Water Quality Control Act, allowing TVA to complete the Columbia Dam and impound the waters of the Duck River. A divided board granted the certificate and permit despite opposition from the appellants, Environmental Defense Fund, Inc., Tennessee Scenic Rivers Association, Inc., Tennessee Citizens for Wilderness Planning, Inc., Tennessee Environmental Council, Inc., and the Sierra Club. On review, the Chancery Court of Davidson County affirmed the decision. The appellants contend that the Board's action involves an illegal ad hoc amendment of its own rules and regulations, and an improper allocation of the burden of proof; and further that the project would degrade the waters of the river and significantly impair its uses for water supply and fish and aquatic life.

As presently planned the Columbia Dam would impound fifty-four miles of the Duck River from just above Columbia to just below Henry Horton Park. In this area the river runs through relatively flat countryside, meaning that the lake created would be the shallowest of TVA's major reservoirs. At normal maximum water level the lake would cover 12,600 acres of land. At the winter elevation of 603 feet, the lake would cover 4,300 acres.

The river basin is also unusually rich in phosphorous, a primary plant nutrient. A nutrient-rich body of water promotes the growth of algae and other aquatic plants, which in turn causes the surface waters to be highly alkaline, depletes the dissolved oxygen in the lower waters, and causes the water to have a bad smell and taste. In general the danger in impounding such a stream is the creation of a body of water in which plant life is favored over animal life.

Where such conditions exist, releases from the reservoir are likely to pass the poor water conditions to the river downstream.

Section 401 of the Federal Water Pollution Control Act, 33 U.S.C. § 1341, requires certification from the appropriate state agency that applicable federal standards are met before a federal licensing agency will grant a permit for construction of projects such as the Columbia Dam. The Tennessee Water Quality Control Act also requires that a state permit be obtained for such projects. T.C.A. § 70–330.

Although TVA started work on the dam several years prior to the hearings in this case, the application for certification and a permit finally came before the board in

1980 when the board decided to hold an evidentiary hearing on both.

The requirements that an applicant for a certificate/permit must satisfy are set forth in the Tennessee Water Quality Control Act, § 70–324 to 342, and in the various standards of quality adopted by the board pursuant to the authority given in that act. Under T.C.A. § 70–330(e) no permit may be issued "for an activity which would cause a condition of pollution either by itself or in combination with others." "Pollution" is defined in T.C.A. § 70–326(u) as:

"Pollution" means such alteration of the physical, chemical, biological, bacteriological, or radiological properties of the waters of this state including but not limited to changes in temperature, taste, color, turbidity, or odor of the waters:

(1) As will result or will likely result in harm, potential harm or detriment of the public health, safety, or welfare; or

(2) As will result or will likely result in harm, potential harm or detriment to the health of animals, birds, fish, or aquatic life; or

(3) As will render or will likely render the waters substantially less useful for domestic, municipal, industrial, agricultural, recreational, or other reasonable uses; or

(4) As will leave or will likely leave the waters in such condition as to violate any standards of water quality established by the board.

The board has classified all streams in the state according to whether they are used or can be used for the following purposes: domestic water supply, industrial water supply, fish and aquatic life, recreation, irrigation, livestock watering and wildlife uses, and, finally, navigation. With the exception of one small stretch of the Duck River below the City of Columbia, the portions of the stream affected by the Columbia Dam project include all the uses except navigation.

For each intended use the board then adopted limits for certain physical and chemical properties of the water that indicate water quality. (We will refer to these properties hereafter as the criteria.) The criteria involved in this case are:

Dissolved oxygen

pH (a measure of the acidity or alkalinity of the water)

Temperature

Hardness or mineral compounds

The criteria vary according to the use planned for the water in the stream. As one would expect, the criteria for recreational uses are more stringent than are the criteria for irrigation or industrial uses. However, the pH range is 6.0 to 9.0 for all uses except the fish and aquatic life use in which the range is 6.5 to 8.5. Tenn.Admin. Comp. 1200–4–3–.03. The same is true of the temperature requirements. For all uses except the livestock and irrigation uses the criteria require temperatures below 30.5° centigrade with no more than a 2° centigrade variation in one hour. *Id.* In general the criteria require 5.0 miligrams of dissolved oxygen per liter measured at a depth of five feet. *Id.*

In addition to the above criteria and in an attempt to further protect waters of exceptional quality, the board has adopted a Tennessee Antidegradation Statement. The heart of the Antidegradation Statement is found in the second paragraph:

The Criteria and Standards shall not be construed as permitting the degradation of waters whose existing quality is better than the established standards unless and until it is affirmatively demonstrated to the Tennessee Water Quality Control Board that a change is justifiable as a result of necessary economic or social development and will not interfere with or become injurious to any assigned uses made of such waters. In no case will water quality be degraded below the base levels set forth in the criteria for the protection of the reasonable and necessary uses described herein. Additionally, no degradation shall be allowed in high quality waters which constitute an outstanding National resource, such as; waters of National and State parks and

wildlife refuges, and waters of exceptional recreational or ecological significance. Tenn.Admin.Comp. 1200–4–3–.06(2)

Faced with the application of these rules the board decided on a bifurcated hearing. The first phase dealt with the question of whether the project would cause violations of water quality criteria or degrade the Duck River and whether the Duck River constitutes an "outstanding resource" under the Antidegradation Statement. The second phase was to determine if the project had social or economic merit if the proof showed the existing quality of the water is better than established standards and impoundment would result in degradation. After hearings in December 1980 and January 1981, the board issued its final decision and order, finding as a fact that the waters of the river now infrequently violate its standards of quality. The board also found that after impoundment there would be more violations, particularly in the dissolved oxygen, pH and temperature levels. These findings are:

1. Above the dam, d.o. [dissolved oxygen] will be above 5.0 milligrams per liter in the epilimnion [the upper or warm layer of the lake water] except for a few insignificant excursions and the annual fall "turnover". The d.o. in the waters of the hypolimnion [the lower or cold layer of the lake water] will be substantially less than 5.0 milligrams per liter. Below the dam, there will be greater variability of d.o.—the mean will be higher and the minimums will be lower. d.o. should be above 5 milligrams per liter in the mixed releases from the dam without significant exception. There may be noticeable odors caused by gaseous $H_2S$ in the vicinity of the dam.

2. Above the dam, based on Normandy, excursions with high pH's can be expected at certain times of the year. Different levels of pH may be ideal for different purposes of treatment. (EPA Quarterly Criteria) There will be diurnal fluctuation of pH in the reservoir from 7.3 to 9.5, pH in the epilimnion will be higher than 8.5 and 9.0 on occasions due to photosynthesis. pH will also be outside the range of 6.5 to 8.5 at certain times. Fluctuations of pH in released waters below Columbia Dam are likely at times to exceed 1.0 unit in 24 hour periods. (The evidence does not support quantification of these deviations). (Anderson 982–83) (See EDF proposed finding 39). Data from below Normandy Dam indicate that pH below Columbia Dam would sometimes be greater than 9.0 reflecting the release of epilimnetic waters. (State exhibit 11; (see Appendix C of EDF's General Notes).) Deviations from the 6.5 to 8.5 range are expected.

\* \* \* \* \* \*

7. Above the dam, surface temperatures can be expected up to about 34°C during summer sunshine. Using Normandy as a model, such excursions will exist for extended periods of time. Average Temperatures in the entire epilimnion during the summer period will be between 25°C and 28°C. Below the dam temperatures should not exceed 30.5°C using Normandy Reservoir as a model. Additionally, the rate of temperture change will not exceed 2°C per hour.

Nevertheless, the board concluded that the dam would not result in any violation of its criteria for any of the assigned uses above or below the dam. The reasons for this conclusion were given as follows:

The Board recognizes that the very change of the container for the state's waters will cause a new environment with a new regime of water quality. The water quality deviations as a result of the dam will not be of such magnitude and duration as to significantly impair uses so as to violate standards.

The board also concluded that the dam would not result in degradation of the waters.

In the Chancery Court the Chancellor concluded that the applicable law and the rules adopted by the board gave the board the discretion to consider the magnitude and duration of the deviations in determining if the board's standards had been violat-

ed. In deference to the board's expertise the Chancellor affirmed the decision.

The first issue raised by the appellants is:

I. The Water Quality Control Board arbitrarily and capriciously failed to enforce the existing, numerical water quality standards for pH and temperature and substituted a new rule that would make the existing standards meaningless.

This issue raises a fundamental question about the function and authority of the board as an administrative body: How far may the board go in allowing deviations from its criteria before its action becomes arbitrary?

Some latitude is given by the rules themselves, as in Tenn.Admin.Comp. 1200–4–3–.02(5):

The criteria of water quality outlined below are considered as guides in applying the water quality objectives in order to insure reasonable and necessary uses of the waters of the State. In order to protect the public health and maintain the water suitable for other reasonable and necessary uses; to provide for future development; to allow proper sharing of available water resources; and to meet the needs of particular situations, additional criteria will be set.

Again, in Tenn.Admin.Comp. 1200–4–3–.05(5) styled "Interpretation of Criteria" the rules provide:

In general, deviations from normal water conditions may be undesirable, but the rate and extent of the deviations should be considered in interpreting the above criteria.

The "rate" of deviations is particularly enigmatic since the criteria do not contain any time factors. Nevertheless, the parties seem to agree that pH and temperature conditions that slightly exceed the criteria and occur only infrequently should be ignored. The appellants concede that much, so long as the excursions are so slight and infrequent as to be de minimus. Of course, the de minimus doctrine implies very small or trifling matters.

Drawing on the latitude given by its rules the board sanctioned the deviations from its criteria because the deviations were not of such "magnitude and duration as to significantly impair uses." Perhaps the use of this language was unfortunate. At least it gave the appellants an opening to charge that the board had, for this case, adopted a new standard which made all the other criteria superfluous. We think, however, that deviations from the board's criteria and the impairment of uses are synonymous. When the board has classified the waters of this state according to their potential uses and has adopted criteria which, presumably, make the waters safe for such uses; if those criteria are violated, the use of the water is to that extent impaired. Otherwise the criteria are meaningless, amounting to a set of arbitrary conditions adopted by the board to be used in an arbitrary fashion.

Thus, if a violation of the criteria equals an impairment of use, then the board's finding that the uses are not significantly impaired is a finding that the violations of the criteria are not significant.

Can the board be sustained in this conclusion?

As a general rule courts must give great deference and controlling weight to an agency's interpretation of its own rules. *Ruangswang v. Immigration and Naturalization Service,* 591 F.2d 39, 43 (9th Cir. 1978); *Costello v. Acco Transport Co.,* 33 Tenn.App. 411, 437, 232 S.W.2d 297, 308 (1949).

A limitation is reached, however, where the interpretation is plainly erroneous or inconsistent with the regulation itself. *Ruangswang v. Immigration and Naturalization Service,* 591 F.2d at 43. In this case we cannot say that the decision of the board is plainly erroneous, nor can we say that the board's interpretation of their own rules is inconsistent with the rules. The rules internally provide that the rate and extent of the deviations can be considered. The board did that and made findings on the rate and extent of the deviations.

While we might agree with the report of the minority of the board that the pH and temperatures which will result in the impounded waters are a significant departure from allowable criteria, we are not at liberty to substitute our judgment for that of the entire board. *Humana of Tennessee v. Tennessee Health Facilities Commission,* 551 S.W.2d 664, 667 (Tenn.1977).

We find the first issue to be without merit.

The appellants' second issue is:

In finding no violation for certain water quality standards, the board improperly taxed the petitioners with the burden of proof.

Although the board found that TVA had the burden of proving that the construction of the dam would not violate water quality standards or cause degradation, the appellants contend that two of the board's findings placed the burden on the appellants to prove the extent of the expected deviations. The first involved the board's finding that pH's well above 9.0 would likely occur below the dam, but the evidence was insufficient to show the frequency of such deviation. The second involved the dissolved oxygen levels below the dam where the board found that at times the levels below the dam would be lower than present, but again, the data was not sufficient to predict with certainty how significant these deviations would be. According to the appellants, TVA should have been *required to* prove that the deviations would *not be significant.*

However, both of the findings of the board should be closely examined. The first dealing with the pH values below the dam is found in finding No. 2 above in the predicted conditions. The conclusions of the board with respect to that finding are found in Paragraph 8 under the conclusions of law:

There will be no violations of the pH criteria either above or below the dam for any of the assigned uses. The deviations that are expected to occur represent no significant impairment of use.

As we read these findings and conclusions, the board found that there would be insignificant excursions beyond the allowable limit; that the proof did not show otherwise.

Conclusions of the board with respect to dissolved oxygen are found in Paragraph 7:

There will be no violation of the Dissolved Oxygen criteria for any of the assigned uses below the dam. The expected D.O. will be higher on a mean basis, but at times will be lower than present. The data is not sufficient to predict with certainty that any significant departure will exist to the extent so as to constitute a violation of the water quality standards.

■ In each of these findings and conclusions, the board says that the proof does not show any significant departures from the criteria. The appellants would have us read the findings and conclusions as "the proof shows significant departures but not how much." Under our reading of the board's findings and conclusions, we conclude that the board did not misplace the burden of proof.

The next issue raised by the appellants is:

The board shut its eyes to its own findings in an unlawful effort to evade application of the Antidegradation Statement.

The Antidegradation Statement adopted by the board appears above.

The board found that the completion of the dam would not degrade the waters of the Duck River. That finding along with the definition of degradation appears in Finding of Fact No. 11:

The construction and operation of the Columbia Dam will not degrade the waters of the Duck River. No single authoritative definition of "degradation" exists, but it is generally understood to mean a reduction of water quality that does not necessarily amount to interference with uses, or a violation of technical water quality criteria, but that has such magnitude and duration as to significant-

ly decrease the margin of safety protecting future uses.

▮ Critical to the board's conclusion was the determination that the waters of the river now meet but do not exceed the levels set out in the criteria for each assigned use. We think there is substantial evidence in the record to support that finding. The present water quality was characterized as "good, average", and not exceptional. Samples at the Lewisburg and Columbia intakes have shown high fecal coliform levels from agricultural run-off, maximum temperatures up to 34°C, pH as high as 9.0, high iron, manganese, and phosphate levels, high turbidity and dissolved solids, algae present in the water, and periodic taste and odor problems.

If the board's conclusion with respect to the present quality of the water is correct the Antidegradation Statement does not apply. By its terms it only applies to waters whose existing quality is better than established standards or to high quality waters that constitute an outstanding national resource. Since the board found that the Duck River is now neither of these, the Antidegradation Statement does not apply to this case.

The final issue raised by the appellants is:

The board erred in concluding that the proposed dam would not significantly impair water uses.

▮ With respect to the findings of fact made by the board, we think they were adequate to support the conclusions drawn. The board made specific findings regarding the present and predicted condition of the water. The findings showed that some of the criteria will be violated some of the time. Based on the findings the board made a judgment decision that the excursions beyond allowable limits would not significantly impair uses. We think that no amount of additional findings would have shed much light on what is "significant." That is a determination that addresses itself to the expertise of the board.

With respect to the cost of treatment the board concluded:

There will be no violations of the Hardness or Mineral Compounds criteria for any of the assigned uses either above or below the dam. Although there will be a higher cost of treatment, the uses will not be significantly impaired.

▮ The conclusion itself reflects the board's opinion that the higher cost of treatment will not be significant. Again, that is a matter that is within the board's expertise and should not be reversed by the court unless it is clearly erroneous. Further, the criteria for domestic water supply uses requires only that "There shall be no substances added to the waters that will increase the hardness or mineral content of the waters to such an extent to appreciably impair the usefulness of the water as a source of domestic water supply." Tenn. Admin.Comp. 1200–4–3–.03. The board found no violation of this criteria. Even though the mineral level may be higher, if the level does not "appreciably" impair the usefulness of the water, then no violation exists.

▮ With respect to aquatic life the board found that just for the reason that a lake is formed out of a free-flowing stream some aquatic life will be adversely affected. However, other forms may flourish in the new environment. The use is not impaired where the losses and the gains balance out. We think the board was within its power to so hold.

We find this issue to be without merit.

The decision of the court below is affirmed and the cause is remanded to the Chancery Court of Davidson County for any further necessary proceedings. Tax the costs on appeal to the appellants.

TODD, P.J. (M.S.), and LEWIS, J., concur.