# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### MAY 4, 2011 Session

## ROGER WILLIAM BYRD, D.C. v. TENNESSEE BOARD OF CHIROPRACTIC EXAMINERS

### Direct Appeal from the Chancery Court for Davidson County
### No. 09-6-III    Ellen Hobbs Lyle, Chancellor

### No. M2010-01473-COA-R3-CV - Filed August 11, 2011

This appeal arises out of disciplinary proceedings against a chiropractor before the Tennessee Board of Chiropractic Examiners. The allegations originally involved a single incident of solicitation that occurred in 2000, in which Dr. Byrd telephoned a car accident victim just two days after her accident in violation of the Board's rule governing telemarketing or solicitation. The notice of charges was later amended to include additional allegations regarding Dr. Byrd's use of an office in Florida to telemarket Tennessee accident victims in violation of the aforementioned rule. Dr. Byrd admitted that telemarketing was being conducted by the Florida employees. However, he claimed that a corporation was responsible for conducting the telemarketing, rather than himself, and he argued that the corporation was not subject to the Board's telemarketing rules. The Board found Dr. Byrd guilty of several violations and revoked his chiropractic license. The chancery court affirmed. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Frank J. Scanlon, Nashville, TN; Robert L.Green, Memphis, TN, for the appellant, Roger William Byrd, D.C.

Robert E. Cooper, Jr., Attorney General and Reporter, Sue A. Sheldon, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Board of Chiropractic Examiners

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Roger William Byrd, D.C. ("Dr. Byrd") was licensed to practice chiropractic in the State of Tennessee in 1998. On July 22, 2005, the State of Tennessee Department of Health filed a Notice of Charges against Dr. Byrd on behalf of the Board of Chiropractic Examiners.[1] The Notice of Charges alleged that in 2000, someone from Dr. Byrd's practice contacted an individual regarding possible treatment just two days after the individual was in an automobile accident in violation of relevant statutes and rules. The Notice of Charges alleged that Dr. Byrd was guilty of "[i]mmoral, unethical, unprofessional or dishonorable conduct" pursuant to Tennessee Code Annotated section 63-4-114(4) and "other unprofessional or unethical conduct that may be specified by the board from time to time by means of rules and regulations duly published and promulgated by the board or the violation of any provision of this chapter" pursuant to section 63-4-114(12), and it also alleged that Dr. Byrd was guilty of violating the following administrative regulation:

> Telemarketing or telephonic solicitation by licensees, their employees, or agents to victims of accidents or disaster shall be considered unethical if carried out within thirty (30) days of the accident or disaster, and subject the licensee to disciplinary action pursuant to T.C.A. § 63-4-114.

Tenn. Comp. R. & Regs. § 0260-02-.20(6)(a).

On April 17, 2008, while these charges were still pending, the State filed a motion to amend the original Notice of Charges, stating that it had received additional complaints of a similar nature against Dr. Byrd and that it "would be judicially more economical to permit an amendment of the pending Notice of Charges rather than requiring the filing of an additional Notice of Charges." The State sought to add the following language, designated "Paragraph 15," to its allegations of fact:

> Since approximately October 2000, Respondent has operated at least one clinic in Tennessee, offering chiropractic and/or medical services. Respondent also has operated an office in Florida which has been used, at least in part, to telemarket for the Respondent's Tennessee clinics. Respondent has used

---

[1] It is the duty of the Board of Chiropractic Examiners to conduct hearings to revoke or suspend a license to practice chiropractic or to otherwise discipline a licensee. Tenn. Code Ann. §§ 63-4-103(2); 63-4-114. Such disciplinary proceedings are to be conducted in accordance with the provisions of the Uniform Administrative Procedures Act. Tenn. Code Ann. § 63-4-115(c).

employees at his Florida office to telemarket accident victims in Tennessee in violation of Rule 0260-2-.20(6) of the Tennessee Board of Chiropractic Examiners.

The State contended that the additional conduct alleged in Paragraph 15 violated the same statutory subsections and administrative regulation cited in the original Notice of Charges. The Administrative Law Judge ("ALJ") granted the State's motion to amend the Notice of Charges on April 30, 2008, noting that "[n]o objection ha[d] been filed by the Respondent."

On July 21, 2008, one month before the proceedings before the Board were scheduled to commence, Dr. Byrd filed a motion to strike Paragraph 15 from the amended notice of charges, or in the alternative, for a more definite statement of charges, contending that the allegations of Paragraph 15 were too vague to allow him to prepare a defense. The ALJ denied the motion to strike, but the State, at the ALJ's suggestion, added another sentence to Paragraph 15 by filing a Second Amended Notice of Charges, which stated, "It is the State's contention that Respondent has engaged in a continuing pattern of telemarketing in violation of the Rules of the Tennessee Board of Chiropractic Examiners over a number of years using a number of employees at various clinics."

Contested case proceedings commenced before the Board of Chiropractic Examiners on August 21, 2008. The State introduced the affidavit of one of Dr. Byrd's former patients, whom we will refer to as S.T., regarding the alleged incident of solicitation in 2000. S.T. stated that she and her husband were involved in a motor vehicle accident in Memphis on June 25, 2000, and that she received a telephone call from the office of Dr. Byrd on June 27, 2000, "to come to his office to get treatment." S.T. stated that neither she nor her husband had been patients of Dr. Byrd prior to his telephone call. S.T. stated that she and her husband went to Dr. Byrd's office the following day and approximately twenty additional times for treatment over the next two months.

Dr. Byrd testified about the incident as well. He explained that after he opened his own office in April 2000, he began performing health screenings at local businesses to try to "get [his] name out" and generate a client base. He testified that he met an elderly woman at one of these health screenings at a local Wal-mart, and "she mentioned that a few days prior that her son and his wife were involved in an auto accident and that they were experiencing some aches and pains[.]" Dr. Byrd testified that the elderly woman asked if there was anything that he could do for her son and daughter-in-law, and he told her that there was a lot that he could do for them. Dr. Byrd testified that the elderly woman then asked if he would call her son and daughter-in-law to invite them to his office because they were hard-headed, and Dr. Byrd said, "I'd love to do so." Dr. Byrd testified that the woman provided him with a cell phone number, so he called the son and daughter-in-law, and they

came to his office for treatment. Dr. Byrd described his contact with S.T. and her husband as a "referral" rather than a solicitation. He testified that he had attempted to locate the elderly woman, S.T.'s mother-in-law, so that she could testify about asking him to call her son and daughter-in-law, but that she was in a nursing home and unable to attend a hearing or deposition. Dr. Byrd also introduced deposition testimony from the elderly woman's physician, who testified that the woman was suffering from Alzheimer's disease and unable to attend a hearing or deposition.

Most of the evidence presented at the hearings concerned the State's allegation that Dr. Byrd was operating at least one clinic in Tennessee that offered chiropractic and/or medical services while also operating an office in Florida which he used to telemarket for his Tennessee clinics. Dr. Byrd testified that in the latter part of 2000, he was contacted by a medical doctor, Dr. Carroll, about combining practices to form an "M.D./D.C. practice."[2] As a result, a corporation called Memphis Accident and Injury Center, P.C. was formed in October of 2000. Dr. Byrd signed the corporation's bylaws as secretary of the corporation, although Dr. Carroll was the sole shareholder. Dr. Byrd signed and filed the corporation's annual report for 2001, listing himself as the corporation's secretary and registered agent and Dr. Carroll as the corporation's president. He listed Dr. Carroll and himself as the two members of the corporation's Board of Directors. Memphis Accident and Injury Center ("MAIC") then began operating at the same location where Dr. Byrd had previously operated his solo chiropractic practice. Dr. Byrd testified that MAIC was a "medical facility" and that he worked there for Dr. Carroll. Dr. Byrd said that MAIC opened another "medical office" in Memphis in 2001, where he worked as a chiropractor "alongside" Dr. Carroll.

Dr. Byrd testified that he moved to Florida in June of 2002, and that he had not personally practiced chiropractic, in Tennessee or Florida, since that time. However, he continued to have some involvement with MAIC's clinics in Tennessee. When Dr. Byrd filed MAIC's corporate annual report for 2002 with the State of Tennessee, he changed the corporation's mailing address to Jupiter, Florida, and again listed himself as the corporate secretary, registered agent, and a member of the Board of Directors. MAIC's "corporate headquarters" was moved to Florida in 2003, although it only operated clinics in Tennessee. In 2004, Dr. Byrd filed a document with the Tennessee Secretary of State in which he stated that he was the Vice President of MAIC. That same day, he filed MAIC's 2003 corporate annual report, identifying himself as the president of MAIC, a member of the Board of

---

[2] Dr. Carroll was an opthalmologist, but Dr. Byrd testified that Dr. Carroll "was getting involved with family practice and other things."

Directors, and the registered agent. He listed his wife as the corporate secretary.[3] MAIC's corporate annual report for 2004 listed Dr. Byrd as the corporation's secretary, registered agent, and a member of the Board of Directors. At some point, Dr. Carroll lost his medical license. In August 2005, Myron Towns, M.D., replaced Dr. Carroll as president and sole shareholder of MAIC. The 2005 and 2006 corporate annual reports for MAIC continued to list Dr. Byrd as the corporation's secretary, registered agent, and a member of the Board of Directors.

By the time of trial, MAIC owned and operated four clinics in Tennessee. MAIC employed several chiropractors at those clinics, and it also employed several nurses, in addition to one medical doctor – Dr. Towns. Dr. Byrd initially testified that MAIC's medical doctor sees "[e]ach and every one" of the clinics' patients, and that the medical doctor then decides whether to refer the patient to one of MAIC's chiropractors "or refer them to wherever they want to." He later testified that either the medical doctor or a nurse practitioner is present at each clinic to evaluate patients and make referrals. MAIC's corporate minutes from 2006 noted that the staff at the four clinics had fluctuated, but stated that they maintained "at least [] the chiropractor and reception clerk at each site."

At the hearing, Dr. Byrd testified that MAIC's corporate office in Florida is basically run by a woman named Claudette, who acts as the office's operations manager, and he said that there are three to four other MAIC employees working at the Florida office as well. Dr. Byrd testified about the various services he performs for MAIC, such as assisting in procuring new locations, leasing office space, locating and leasing equipment, maintaining equipment, dealing with insurance companies and attorneys, and helping with accounting and the accounts payable and receivable. However, Dr. Byrd insisted that he is not an employee of MAIC and that he does not receive any money from MAIC. Dr. Byrd testified that he performs these services for MAIC pursuant to a "service agreement contract" that exists between MAIC and a "consulting corporation" he owns called RWB Management Company, Inc. Dr. Byrd explained that the initials "RWB" are for "Roger W. Byrd," and that he is the sole shareholder and an officer of RWB Management Company, while his wife is the corporate secretary. Although Dr. Byrd insisted that he had not received "a penny" from MAIC, he conceded that RWB Management Company is paid by MAIC based on the services that he performs for MAIC, and that he is paid by RWB Management Company for

_____

[3] In 2008, just prior to his deposition in this matter, Dr. Byrd filed "Articles of Correction" with the Secretary of State, stating that he had erroneously identified himself as the Vice President and President of MAIC and erroneously listed his wife as the Secretary. He indicated that his correct title was secretary of MAIC. Dr. Byrd also testified that he had mistakenly listed himself as a member of the Board of Directors when he filed the annual reports every year, although the record does not contain Articles of Correction regarding these errors. Dr. Byrd explained that if he had testified during his deposition that he was on MAIC's Board of Directors, it was because he was having a "mental block."

providing management services to the MAIC clinics. When Dr. Byrd was asked to estimate the amount of income that RWB Management Company received from MAIC in the previous year, Dr. Byrd said that he could not provide such an estimation, and he said that he did not know whether the income exceeded one million dollars.

Dr. Byrd testified that he visits MAIC's Florida office about once every three weeks to bring mail to the office and help Claudette with any issues, such as bookkeeping or accounting matters. Dr. Byrd testified that he signs the leases for MAIC's office locations in Tennessee as secretary of MAIC. He also testified that when MAIC hires chiropractors, he interviews and hires the chiropractors and signs the employment contracts on behalf of MAIC. He also signed and filed the corporate annual reports for MAIC every year. Dr. Byrd conceded that he signs the checks for MAIC and is the assignee and only signatory on MAIC's bank account, but he insisted that this was also due to his position as secretary of the corporation. Dr. Byrd said that he did not know who signs MAIC's tax returns, but he acknowledged that MAIC's accountant is located in Florida and stated, "It could be me."

Dr. Byrd testified that he had nothing to do with the day-to-day operations of the MAIC corporate office in Florida, but he said that it was his "understanding" that MAIC does employ independent contractors to do telemarketing for MAIC's Tennessee clinics. Dr. Byrd. testified that he does not select, train, or supervise the telemarketers and that he has "nothing to do with them whatsoever." Dr. Byrd said that he had never in any way, through RWB or otherwise, instructed or given guidance on implementing MAIC's telemarketing system or how the telemarketing was handled, and he claimed that he did not "have a say in the telemarketing business." Dr. Byrd claimed that Dr. Towns was the sole owner and sole decision maker for MAIC. In short, Dr. Byrd admitted that telemarketing was occurring at MAIC, but he claimed that the telemarketing was not engaged in at his instruction or on his behalf, and he claimed that he was not benefitting from the telemarketing.

At the hearing before the Board, the State introduced the deposition of Dr. Nichole Cox, a licensed chiropractic physician who worked at MAIC's Nashville clinic, Bell Road Health and Injury Center, for three to four months in 2006. Dr. Cox testified that Dr. Byrd interviewed her, hired her, and signed her employment contract, and she said that Dr. Byrd told her that he owned the business. She testified that Dr. Byrd required her to provide him with a list of her patients' names when she began her employment because "Dr. Byrd wanted to make sure that patients that he brought into the clinic would remain his."

Dr. Cox acknowledged that Dr. Byrd referred to the clinic as a "medical facility," but she described the clinic as a "medical chiropractic facility." Dr. Cox explained that during her employment, she was the only physician working at that MAIC clinic location. She said she saw all of the patients who came into the clinic as the "treating physician." Dr. Cox

testified that she was required to contact Dr. Byrd if she was going to miss work. Dr. Cox testified that a nurse would come into the office once or twice a week, and that Dr. Towns came to the clinic maybe six times during her employment to review records. Dr. Cox testified that she did not remember Dr. Towns ever seeing patients.

Dr. Cox testified that all of the patients she saw had been in auto accidents, and the accidents had generally occurred within the previous one to two weeks. Dr. Cox testified that the patients had appointments that were scheduled by someone other than employees of the Bell Road Health and Injury Center, and she said that patients would arrive and say that they had received a telephone call with instructions to come to the clinic to be checked out. Dr. Cox said she concluded that the calls were coming from Florida based on what patients would say to her and the fact that people from Florida called the clinic to ask whether patients had come in for their scheduled appointments. She testified that several individuals were employed to go to the police stations and obtain names and information of people who had been in car accidents, and the individuals would then come to the clinic and fax the information down to Florida.

An investigator for the Tennessee Department of Health, Division of Health Related Boards, testified that she had interviewed Dr. Byrd during the course of a 2003 investigation following a telemarketing complaint, and at that time, Dr. Byrd described himself as an employee of and the manager of the MAIC clinics. However, the investigator testified that the office manager of the clinics, whom she also interviewed, identified Dr. Byrd as her boss. Another investigator testified that during a separate investigation in 2008, she asked Dr. Byrd about his involvement with the Bell Road Injury Center, where Dr. Cox was employed, and that Dr. Byrd said he had "no involvement with that clinic whatsoever." She said Dr. Byrd denied training Dr. Cox or having any type of relationship with her.

Dr. Towns testified by deposition as well. He explained that in order to replace Dr. Carroll as president and sole shareholder of MAIC, he paid something "nominal" to the corporation, such as ten dollars, one hundred dollars, or one dollar, in exchange for ten shares of stock. Dr. Towns testified that he operates a pain clinic in Winchester, Tennessee, which serves as his main source of income, and that he also maintains a separate "addiction practice." In addition, he testified that he works at one of the four MAIC clinics approximately one day per week. He explained that he is most often at one of the MAIC clinics for administrative purposes rather than for patient appointments. Dr. Towns said that he sees some but not all of MAIC's patients and that he does not prescribe controlled substances generally to MAIC patients. He said that he sees patients that are presenting a problem for one of the chiropractors or nurses. Dr. Towns testified that he is paid a salary of $1,800 per month, and that he can request payment on an hourly basis for doing certain other things.

Dr. Towns testified that MAIC's clinics are managed by Dr. Byrd's corporation, which he referred to as RWB Incorporated. He testified that the marketing decisions for MAIC are made by Dr. Byrd and himself as the corporation's officers or "executive committee." When Dr. Towns was asked who originally had the idea to telemarket to accident victims, he replied, "It's a standard procedure. I don't know whose idea it was first." However, he went on to state that Dr. Byrd had told him that he had hired a company to do some telemarketing. Dr. Towns did not know the name of the company that Dr. Byrd hired, but he said that he had a conversation with Dr. Byrd about the script that the telemarketers used, and Dr. Byrd provided him with a copy of the script. Dr. Towns testified that it was his understanding that the telemarketers were calling people based on information they obtained from police departments. When asked whether they target individuals who have been in accidents, he replied, "That's the objective, yes."

The Board also heard live testimony from Claudette, who serves as MAIC's operations manager or administrative assistant at the corporate office in Florida. Claudette testified that MAIC pays her an annual salary of $55,000 to $57,000. She testified that MAIC employs two "marketers" at its Florida office. She also explained that MAIC employs independent contractors to go to police stations and accident reporting stations in Tennessee, examine public records, and call in information to her assistant in Florida. She explained that the two marketers then make telephone calls to people who have recently been involved in automobile accidents.

Claudette testified that she had never met Dr. Towns and that he had never been to the Florida office. She testified that Dr. Byrd, on the other hand, comes to the Florida office every two to three weeks to bring the mail and handle issues with equipment. She said Dr. Byrd also handles MAIC's payroll. She insisted that Dr. Byrd had nothing to do with the telemarketing business. Claudette also testified that Tennessee's telemarketing rules were "not relevant to me because we're a medical facility and I'm not a chiropractor."

Finally, the Board heard affidavit and deposition testimony from Charles Sheehan. Mr. Sheehan testified that he was employed as a telemarketer by Dr. Byrd for approximately two months in 2006 at the Florida office. He said that each day, he was given a list of accident victims in Tennessee that included the date of the accident for each victim, and he was instructed to telephone the individuals as soon as possible, preferably within one to two days "before anyone else had a chance to talk to them." Mr. Sheehan testified that it was his understanding that "Roger Byrd is M.A.I.C.," explaining, "That's what he told me."

After the Board's deliberations, it entered an order finding that someone from Dr. Byrd's practice had contacted patient S.T. two days after her automobile accident regarding the possibility of treatment. It also found that Dr. Byrd had operated at least one clinic in

Tennessee, in addition to an office in Florida, which he used to telemarket for his Tennessee clinics. The Board concluded that such conduct was unprofessional or unethical and in violation of Tennessee Code Annotated section 63-4-114(4) and (12), and in violation of the Board's telemarketing regulation found at Tenn. Comp. R. & Regs. § 0260-02-.20(6)(a). The Board revoked Dr. Byrd's chiropractic license and assessed the costs associated with the prosecution of this matter to Dr. Byrd.

Dr. Byrd subsequently filed a petition for judicial review in the chancery court of Davidson County, seeking review of the Board's decision pursuant to Tennessee Code Annotated section 4-5-322. Dr. Byrd contended that there was no substantial and material evidence to support the Board's decision that he violated the Board's telemarketing rule and that the Board's decision was made upon unlawful procedure due to the ALJ's decision to allow the State to amend the Notice of Charges. The chancery court entered a lengthy memorandum and order finding no merit in Dr. Byrd's allegations and dismissing the petition with prejudice. Dr. Byrd then appealed to this Court.

## II. ISSUES PRESENTED

Dr. Byrd presents the following issues for review on appeal:

1. Whether the Board's decision to discipline Dr. Byrd for the alleged incident of solicitation in 2000 was arbitrary and capricious;
2. Whether the ALJ erred as matter of law and utilized unlawful procedure by allowing the State to amend the Notice of Charges to raise vague and unspecified allegations of misconduct spanning an eight year period;
3. Whether the Board's finding that MAIC's telemarketing should be imputed to Dr. Byrd was unsupported by substantial and material evidence;
4. Whether the Board's finding that MAIC is a mixed medical and chiropractic provider was unsupported by substantial and material evidence.

For the following reasons, we affirm the decision of the chancery court and that of the Board.

## III. STANDARD OF REVIEW

"Judicial review of decisions of administrative agencies, when those agencies are acting within their area of specialized knowledge, experience, and expertise, is governed by the narrow standard contained in Tenn. Code Ann. § 4-5-322(h) rather than the broad standard of review used in other civil appeals." *Roy v. Tenn. Bd. of Med. Examiners*, 310 S.W.3d 360, 363 (Tenn. Ct. App. 2009). Pursuant to Tennessee Code Annotated section 4-5-322(h), this Court may only reverse or modify the Board's decision if Dr. Byrd's rights were

prejudiced because the Board's findings, inferences, conclusions or decisions were:

(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.
    (B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

In addition, "[n]o agency decision pursuant to a hearing in a contested case shall be reversed, remanded or modified by the reviewing court unless for errors that affect the merits of such decision." Tenn. Code Ann. § 4-5-322(i).

## IV.  DISCUSSION

### A.    The 2000 Incident

Dr. Byrd's first argument on appeal is that it was arbitrary and capricious for the Board to impose any kind of disciplinary sanction for the incident of solicitation that occurred in 2000 involving patient S.T. Dr. Byrd does not dispute that he contacted S.T. two days after her automobile accident. However, he basically claims that the fact that he called S.T. at the request of her mother-in-law somehow negates a finding that his conduct was unethical. Dr. Byrd contends that the Board's regulation prohibiting solicitation within thirty days of an accident "is obviously meant to apply to a random, impersonal cold call of an accident victim," and is inapplicable to the situation at hand. Dr. Byrd also argues that it was "unfair and pointless" to punish him in 2008 for conduct that occurred in 2000.

Again, the Board's regulation states:
Telemarketing or telephonic solicitation by licensees, their employees, or agents to victims of accidents or disaster shall be considered unethical if carried out within thirty (30) days of the accident or disaster, and subject the licensee to disciplinary action pursuant to T.C.A. §63-4-114.

Tenn. Comp. R. & Regs. § 0260-02-.20(6)(a). During the Board's deliberations in this case, several Board members acknowledged Dr. Byrd's contention that his conduct was

appropriate because it was in response to a request from the accident victim's mother-in-law. Nevertheless, the Board concluded that contacting S.T. within two days of her accident violated its regulation. The Board members made comments such as, "the rules say, you know, don't call," and, "We're looking at it as a basic rule." Several Board members also noted that Dr. Byrd could have simply told the mother-in-law to have S.T. call his office, stating that they "knew better" than to call someone themselves.

As a general rule, courts must give great deference and controlling weight to an agency's interpretation of its own rules and regulations, except where the interpretation is plainly erroneous or inconsistent with the regulation itself. *Exxon Corp. v. Metro. Gov't of Nashville & Davidson County*, 72 S.W.3d 638, 641 (Tenn. 2002) (citing *Env. Defense Fund, Inc. v. Tenn. Water Quality Control Bd.*, 660 S.W.2d 776, 781 (Tenn. Ct. App. 1983)). We find that the Board's interpretation in this case is consistent with the plain language of the regulation itself and not plainly erroneous. The rule clearly prohibits telemarketing *or* telephonic solicitation to victims of accidents within thirty days of an accident, without exception. Tenn. Comp. R. & Regs. § 0260-02-.20(6)(a). Thus, it was not arbitrary or capricious for the Board to conclude that Dr. Byrd violated the regulation by contacting S.T. just two days after her accident, even if he did so at the request of a family member.

We also find that it was not arbitrary or capricious for the Board to discipline Dr. Byrd for the incident of solicitation that occurred in 2000, even though the Board's final order imposing the discipline was entered eight years later. Dr. Byrd cites no authority for his contention that it was inappropriate to discipline him due to the passage of time. Moreover, we will not substitute our judgment as to an appropriate sanction for that of the agency responsible for enforcement. *See City Towing & Transport, Inc. v. Transp. Licensing Comm'n of Metro. Gov't of Nashville & Davidson County*, No. M2007-01246-COA-R3-CV, 2009 WL 276761, at *4 (Tenn. Ct. App. Feb. 3, 2009). Because the appropriate remedy is peculiarly within the discretion of the agency, we will only review whether the remedy is "unwarranted in law" or "without justification in fact." *Robertson v. Tenn. Bd. of Social Worker Certification & Licensure*, 227 S.W.3d 7, 13-14 (Tenn. 2007). Here, the Board's remedy was warranted in law and justified in fact. Therefore, we affirm the Board's decision to discipline Dr. Byrd for the incident of solicitation that occurred in 2000.

### B.    *The Amendment to the Notice of Charges*

Next, Dr. Byrd argues that the ALJ erred as a matter of law by allowing the State to amend the Notice of Charges to include Paragraph 15, which, in its final form, contained the following allegations:

Since approximately October 2000, Respondent has operated at least one clinic

in Tennessee, offering chiropractic and/or medical services. Respondent also has operated an office in Florida which has been used, at least in part, to telemarket for the Respondent's Tennessee clinics. Respondent has used employees at his Florida office to telemarket accident victims in Tennessee in violation of Rule 0260-2-.20(6) of the Tennessee Board of Chiropractic Examiners. It is the State's contention that Respondent has engaged in a continuing pattern of telemarketing in violation of the Rules of the Tennessee Board of Chiropractic Examiners over a number of years using a number of employees at various clinics.

Dr. Byrd characterizes Paragraph 15 as mere allegations "about alleged acts of telemarketing that took place sometime during an eight (8) year period, to unidentified individuals by unidentified employees for chiropractic services at one of several unidentified clinics from an unspecified location in Florida." Dr. Byrd contends that the vagueness of Paragraph 15 "was inherently prejudicial to his constitutional and statutory due process right to notice."[4]

In a contested case, the parties are entitled to reasonable notice, which must include "'[a] short and plain statement of the matters asserted.'" *McClellan v. Bd. of Regents of State Univ.*, 921 S.W.2d 684, 688 (Tenn. 1996) (quoting Tenn. Code Ann. § 4-5-307(a)(3)). We conclude that Paragraph 15 was a sufficient "short and plain statement" of the allegations against Dr. Byrd to provide reasonable notice under the facts of this case. It alleged that Dr. Byrd had operated at least one clinic in Tennessee that offered chiropractic and/or medical services, in addition to operating an office in Florida, which he used to telemarket accident victims in Tennessee for his Tennessee clinics. Moreover, we conclude that Dr. Byrd has failed to demonstrate that he was prejudiced by the alleged lack of specificity of Paragraph 15. Dr. Byrd does not dispute that MAIC operates an office in Florida which is used, at least in part, to telemarket accident victims in Tennessee for its Tennessee clinics. Thus, as the chancery court found, "more specificity of the how, when and where of the telemarketing [was] irrelevant to his defense, and the absence of such specificity did not prejudice the petitioner." The facts regarding Dr. Byrd's connection to MAIC were within his knowledge and control, and Dr. Byrd was made aware of the State's witnesses and evidence well in advance of the hearing. Therefore, we reject Dr. Byrd's assertion that the Board's decision

_____

[4] As previously discussed, Dr. Byrd did not file a response to the State's motion to amend the Notice of Charges, but shortly before the proceedings before the Board were scheduled to commence, he filed a motion to strike the amendment and alternatively requested a more definite statement "as to the time, places, dates and persons involved so that the Respondent [would be] on Notice of exactly what activities and violations he [would] be confronted with at the hearing." When hearing Dr. Byrd's motion, the ALJ stated that Dr. Byrd could have engaged in discovery to learn the details he sought, to which Dr. Byrd's counsel responded, "I'm not interested in taking discovery. I just want her to tell me in the complaint what she intends to prove."

must be reversed due to alleged insufficiencies in Paragraph 15.

### C.    Dr. Byrd's Connection to MAIC

Next, Dr. Byrd argues that there is no substantial and material evidence to support the conclusion that MAIC's telemarketing should be imputed to him.  The Board's regulation prohibits telemarketing or telephonic solicitation within thirty days of an accident "by licensees, their employees, or agents," and it provides that such solicitation will subject the licensee to disciplinary action.  Dr. Byrd points out his testimony that he has no financial interest in MAIC, that he is not an employee of MAIC, and that he has nothing to do with MAIC's telemarketing.  Dr. Byrd claims that his "only connection to MAIC is the contract that RWB, a management company he owns, has with MAIC to provide various services[.]"  Dr. Byrd contends that it is Dr. Towns who controls and directs MAIC.

The substantial and material evidence standard requires something less than a preponderance of the evidence but more than a scintilla or glimmer.  ***Dickson v. City of Memphis Civil Serv. Comm'n***, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005); ***Mosley v. Tenn. Dep't of Commerce & Ins.***, 167 S.W.3d 308, 316 (Tenn. Ct. App. 2004).  Courts may not reweigh the evidence or substitute their judgment for the Board's, even if the evidence could support a conclusion different from the one reached by the Board.  ***Miller v. Civil Serv. Comm'n of Metropolitan Gov't of Nashville & Davidson County***, 271 S.W.3d 659, 665 (Tenn. Ct. App. 2008).  "We may reject the Board's decision only if a reasonable person would necessarily reach a different conclusion based on the evidence. It is not enough that the facts could support a different conclusion." ***Davis v. Shelby County Sheriff's Dep't***, 278 S.W.3d 256, 265 (Tenn. 2009) (citing *Martin v. Sizemore*, 78 S.W.3d 249, 276 (Tenn. Ct. App. 2001)).  In other words, we "review the record for such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." ***Miller v. Tenn. Bd. of Nursing***, 256 S.W.3d 225, 229 (Tenn. Ct. App. 2007) (citing *Clay County Manor, Inc. v. State*, 849 S.W.2d 755, 759 (Tenn. 1993); *S. Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984); *Papachristou v. Univ. of Tenn.*, 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000)).

In the case at bar, we find substantial and material evidence to support the Board's conclusion that it is in fact Dr. Byrd who operates MAIC and has MAIC employees to telemarket for the Tennessee clinics in violation of the Board's telemarketing regulation. Dr. Byrd has been involved with MAIC since it was formed in 2000.  He signed MAIC's bylaws as secretary of the corporation and continued to serve in that capacity at least until these proceedings began.  He also served as registered agent for the corporation, and there is evidence to support a finding that he served on the Board of Directors as well.

MAIC opened its first clinic at the same location where Dr. Byrd's solo practice had previously operated. Shortly after Dr. Byrd moved to Florida, MAIC's corporate headquarters was moved to Florida. Dr. Byrd performed numerous services for MAIC, such as assisting in procuring new locations, leasing office space, locating and leasing equipment, maintaining equipment, bringing the mail, dealing with insurance companies and attorneys, and helping with bookkeeping and accounting matters. Dr. Towns, on the other hand, has never been to MAIC's corporate headquarters in Florida. Dr. Byrd signed leases on behalf of MAIC and signed and filed its corporate annual reports. Dr. Byrd interviewed and hired chiropractors for MAIC and signed employment contracts on MAIC's behalf. Dr. Byrd signed checks for MAIC as the only signatory and the assignee on its bank account, and Dr. Byrd also handled MAIC's payroll.

MAIC pays Dr. Byrd's corporation for Dr. Byrd's services, and the corporation then pays Dr. Byrd. Dr. Byrd testified that he could not recall the amount of such compensation and said he did not know whether it exceeded one million dollars annually. At the same time, Dr. Towns only received $1,800 per month in salary from MAIC, while Claudette, the operations manager or administrative assistant, received a $56,000 salary.

Dr. Towns testified that he and Dr. Byrd made decisions about marketing for MAIC as the corporation's officers or executive committee. He testified that he did not know the name of the company who conducts telemarketing for MAIC, but that Dr. Byrd told him that he had hired a company to do telemarketing, and Dr. Byrd had provided him with a copy of the script that the company was using.

The Board also had before it Dr. Cox's testimony that Dr. Byrd hired and interviewed her and that he told her that he owned the business. She also testified that Dr. Byrd was concerned about "his" patients remaining his.

In sum, we find that the evidence before the Board provides a reasonably sound basis for its conclusion that it is Dr. Byrd who operates and controls MAIC and its telemarketing activities. Therefore, substantial and material evidence supports the Board's finding that its regulation was violated because telemarketing was being conducted by Dr. Byrd, his employees, or agents. Dr. Byrd's argument to the contrary is without merit.[5]

---

[5] We note Dr. Byrd's argument that Mr. Sheehan was a disgruntled former MAIC employee whose testimony could not be considered disinterested or credible. We did not mention Mr. Sheehan's testimony in our discussion of this issue because substantial and material evidence exists to support the Board's conclusions even without Mr. Sheehan's testimony.

### D. MAIC as a "Medical Corporation"

The Board found that MAIC provides "chiropractic and/or medical services." Nevertheless, Dr. Byrd argues that the Board's telemarketing regulation does not apply to MAIC because, according to Dr. Byrd, MAIC is a "medical professional corporation" that is solely owned by a medical doctor. Dr. Byrd contends that the Board's telemarketing rule only applies to chiropractors. As noted above, however, the Board's rule prohibits telemarketing "by licensees, their employees, or agents" within thirty days of an accident. Therefore, Dr. Byrd cannot simply circumvent the Board's rule by having MAIC's employees or agents conduct telemarketing that would otherwise be prohibited. Dr. Byrd is, himself, a chiropractor, and he is essentially directing that telemarketing be performed on behalf of the other chiropractors who are employed by MAIC. Tennessee Code Annotated section 48-101-610(d) authorizes certain health care professionals, such as chiropractic physicians and certain other physicians, to form and own shares in the same professional corporation, but it specifically provides that "nothing in this part shall be construed to allow any professional forming a professional corporation pursuant to this subsection (d) to conduct the professional's practice in a manner contrary to the standards of ethics applicable to the profession." In other words, a chiropractor cannot conduct a practice in a manner that is contrary to the standards of ethics applicable to the profession simply by using the shield of a professional corporation. The Board of Chiropractic Examiners retains the authority to discipline or revoke "any license to practice chiropractic" whenever the licensee is found guilty of immoral, unethical, unprofessional or dishonorable conduct. Tenn. Code Ann. § 63-4-114(4). Therefore, we reject Dr. Byrd's suggestion that the Board lacked the authority to revoke his license due to the nature of MAIC's corporate structure.

### V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court and that of the Board of Chiropractic Examiners. Costs of this appeal are taxed to the appellant, Roger W. Byrd, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.